UNITED STATES DISTRICT COURT FOR
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

*US DISTRICT COURT WESTERN DIST ARKANSAS FILED AUG 0 7 2015 CHRIS R. JOHNSON, Clerk By _____ Deputy Clerk*

| | |
|---|---|
| (1)   JOHN DOE, <br><br> Plaintiff, <br><br> v. <br><br> (2)   CORIZON, INC., f/k/a Correctional Medical Services, Inc., <br><br> (3)   CORRECT CARE SOLUTIONS, LLC., <br><br> (4)   BENTON COUNTY SHERIFF'S OFFICE, a/k/a Kelley Cradduck, in his official capacity as Sheriff of Benton County, AR, <br><br> Defendants. | Case No.: 15-5184 TLB <br> JURY TRIAL REQUESTED |

### COMPLAINT

**COMES NOW**, John Doe, (hereinafter "Doe" or Plaintiff), and for his cause of action against the above-named Defendants, would state as follows:[1]

### I.   INTRODUCTION

Plaintiff brings a negligence claim against Corizon, Inc. ("Corizon") and Correct Care Solutions, LLC ("CCS") for negligence in the failure to obtain and administer HIV medication consistent with the standard of care within a prison facility.

---

[1] A motion for leave to proceed using a pseudonym is filed contemporaneous with the Complaint. If the motion is granted, Plaintiff requests leave to file a duplicate of the Complaint under seal using his real name for disclosure to the unserved Defendants.

Plaintiff brings this action against the Benton County Sheriff's Office, a/k/a Kelley Cradduck, in his official capacity as Sheriff of Benton County, AR ("Sheriff's Office") pursuant to Title II of the American's with Disabilities Act as Amended ("ADAAA") for segregation and discriminatory exclusion of HIV positive detainees from access to programs and services offered at the Benton County Jail ("BCJ") including but not limited to the equal benefit of prescriptive services, outdoor recreation, regular socialization, and equal access to telephones, showers and religious services.

## II.     PARTIES, JURISDICTION, VENUE

1. Doe is a resident of McLennan County, Waco, Texas. Doe is a former inmate of the Ouachita River Correctional Unit ("ORCU") which is under the authority of and is run by the Arkansas Department of Corrections ("ADC").

2. CCS is a Tennessee for-profit corporation that is or was doing business in Arkansas and contracted to provide medical care and services to prisoners in the custody and care of ADC including the acquisition and administration of life-sustaining antiviral HIV medication.

3. Corizon is a Missouri for-profit corporation that is or was doing business in Arkansas and contracted to provide medical care and services to prisoners in the custody and care of ADC, including the acquisition and administration of life-sustaining antiviral HIV medication.

4. The Sheriff's Office for Benton County is responsible for employees at the BCJ.

5. The events complained of herein occurred in Hot Spring County, Arkansas and Benton County, Arkansas making jurisdiction and venue proper.

6. This action arises under Title II of the ADAA and common law medical negligence.

7. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1343(a)(3)&(4), and 28 U.S.C. Section 2201 & 2202 which creates a private cause of action to redress deprivation of rights guaranteed by the Constitution of the United States. The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1367 to adjudicate claims arising under the laws of the State of Arkansas. Venue of this Court is proper pursuant to 28 U.S.C. Section 1391in that all the acts and conduct complained of herein and all claims raised herein arose with the corporate boundaries of Benton County, Arkansas, and Hot Springs County, Arkansas, encompassed within the Western District of Arkansas.

### III. STATEMENT OF FACT

8. On or around August 8, 2013, ADC assumed custodial care for Doe, who was transported to ORCU. As part of the intake screening, ADC administered a series of blood tests, including a test for HIV.

9. On or about August 9, 2013, ADC received notice that Doe had tested positive for the HIV virus. ADC informed Doe of the test results and provided him with a HIV counseling form.

10. Prior to the disclosure by ADC, Doe was not aware that he was HIV positive. The disclosure caused Doe great concern for his prognosis. This concern naturally combined with Doe's fear of the uncertainty surrounding the virus and his present disease state.

11. It is well understood that HIV attacks and destroys infection-fighting CD4 cells in the human body's immune system, thereby inhibiting the immune system's ability to fight off infection. For a person infected with HIV, it is still currently a lifelong disease. Without early treatment, HIV can lead to a greater incidence of infection and aggravate associated diseases, including cardiovascular disease, kidney disease, liver disease, and cancer. If the disease progresses, HIV can severely weaken the immune system resulting in, among other symptoms, rapid weight loss, fever, tiredness, swollen lymph nodes, diarrhea, sores, pneumonia, skin blotches, and neurological disorders.

12. As set forth in guidelines published by the United States Department of Health and Human Services in October 2011 for the use of Antiretroviral Agents in HIV-1 Infected Adults, HIV care practitioners along with more than 30 members with HIV expertise from the CDC, FDA, HRSA and NIH have established a standard of care for antiretroviral therapy that does not permit medical providers to subject HIV positive individuals to involuntary treatment interruptions relative to HIV medication, *i.e.*, Highly Active Antiretroviral Therapy ("HAART"). See *Guidelines for the Use of Antiretroviral Agents in HIV-1 Infected Adults and Adolescents*, p. H-1 (published Oct. 14, 2011) ("Discontinuing or briefly interrupting therapy in a patient with viremia may lead to a rapid increase in HIV RNA and a decrease in CD4 cell count and increases the risk of clinical progression. Therefore, this strategy is ***not***

recommended.") (emphasis in original).

13. Successful HIV treatment, which reduces "HIV-associated morbidity and prolong[s] the duration and quality of survival," requires adherence to the prescribed medication regimens. *See* HHS Panel on Antiretroviral Guidelines for Adults and Adolescents, *Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents*, AIDSINFO, 24 (Oct. 14, 2011), http://www.aidsinfo.nih.gov/ContentFiles/AdultandAdolescentGL.pdf; *see also id*. at 122 ("Adherence to antiretroviral therapy (ART) has been strongly correlated with HIV viral suppression, reduced rates of resistance, an increase in survival, and improved quality of life.").

14. On October 9, 2013, initial blood tests determined that Doe had a CD4 count of 184, below the threshold for designating a person as having AIDS. But rather than prescribe HAART medication consistent with the U.S. Department of Health and Human Services, CCS and/or Corizon prescribed, Bactrim, a useless medication to combat HIV.

15. In November 2013, ADC transferred Doe to the BCJ for certain district court proceedings. ADC transferred Doe with a supply of Bactrim that would last for approximately two weeks. Based on the administration instructions, it was foreseeable that Doe would exhaust his supply of Bactrim.

16. When Doe arrived at the BCJ, staff processed him into the facility, inventoried his property, including the supply of Bactrim, and assigned him to E-Block-pod 107, a general population housing unit.

17. Inmates in E-Block-pod 107 are not locked down in their cells except during lights out. This provides the inmates in E-Block-pod 107 the freedom to move about the housing unit as they please and without obtaining permission from anyone.

18. E-Block-pod 107 is also equipped with a telephones and shower stalls that inmates can freely use without permission. E-Block-pod 107 also contains a variety of games/distraction activities for the inmates, and upon information and belief, the BCJ regularly provides religious services to inmates E-Block-pod 107. E-Block-pod 107 affords greater access to medical staff and nurses than segregated pod units. Access to the jail library and the ability of inmates to access reading materials is more accommodated for inmates located in E-Block-pod 107.

19. After spending approximately a week in E-Block-pod 107, a jailer summoned Doe and inquired about his medication. The jailer asked why Doe was taking Bactrim, and Doe merely responded that he needed medication from ADC.

20. Approximately one hour later, the jailer returned and once again summoned Doe. This time the jailer instructed Doe to gather his belongings because he was being transferred to the segregation unit at the BCJ, known as E-Block-pod 102. Doe asked the jailer why, and the jailer responded that it was because of Doe's HIV status. Doe was told by the jail staff that his HIV status made him a safety risk to everyone.

21. The inmates in E-Block-pod 102 are locked down in their cells 23 hours each day. They are not permitted to freely move about the dayroom to socialize with others, and outdoor recreation is prohibited. They are not permitted to recreate together, and must spend

the one hour out of their cell isolated from the other inmates in the housing unit.

22. Upon information and belief, E-Block-pod 102 is not equipped with telephones available to the inmates inside the cells, and showers are only permitted when allowed by a jail employee. Upon information and belief, E-Block-pod 102 offers no games/distraction activities for the inmates. Upon information and belief, the BCJ does not provide church services in E-Block-pod 102 like those provided in the general population pod, and access to medical care is more restricted.

23. Upon information and belief, Doe alleges that BCJ has a policy and practice of housing all HIV positive inmates in the same cell, inside a segregated housing unit or pod.

24. Doe remained at BCJ from November 2013 until December 2013 when he was transferred back to the custodial care of ADC.

25. Despite knowledge that Doe was HIV positive, BCJ never provided him with any HAART medication, and it failed to provide continuity of care in the administration of the medication provided by ADC's contracted medical providers, CCS and/or Corizon.

26. Upon his return to the custodial care of ADC, Doe continued to seek medical care for his HIV. All efforts were ignored.

27. Despite knowledge of Doe's HIV positive status, ADC's contracted medical providers, including CCS and Corizon, failed to provide Doe with life-sustaining antiretroviral medications to control his HIV at any time throughout his detention.

28. Doe repeatedly sent verbal and written requests for medical care, treatment and medication to help combat the deadly virus, but CCS and Corizon either failed or refused to provide HAART medication or adequate medical therapy to treat HIV.

29. After Doe's discharge from ADC in February 2014, Doe's documentation from ADC revealed a document acknowledging that he tested positive for HIV on August 8, 2013, and that as of February 21, 2014, Doe was still without any medication for treatment of HIV.

30. Doe was released from ORCU and ADC custody on or about February 26, 2014.

31. Despite actual knowledge that Doe would require life-sustaining HIV medication, CCS and Corizon did nothing to initiate or ensure the continuity of care in the administration of Doe's antiviral HIV medication. The failure to initiate and/or provide continuity of care under these circumstances violated the standard of care for the administration of HAART in a correctional setting.

32. Doe's placement in segregation isolated him from others, caused stress, anxiety, sleeplessness, despair, depression, hopelessness and agitation. The effects of isolation were further enhanced by Doe's concern that his medical condition would deteriorate and worsen as a consequence of the increased stress imposed by prolonged isolation and the failure to initiate or provide continuity of care in the administration of HIV medication.

33. Doe reasonably believed that the failure to initiate or provide HAART could result in dramatic and irreversible consequences leading to a substantial deterioration in his

health and premature death. The medical situation created by CCS and Corizon was exceedingly reckless and subjected Doe to physical discomfort and psychological harm.

### IV. STATEMENT OF CLAIMS

#### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AS AMENDED DISCRIMINATORY EXCLUSION FROM SERVICES GENERALLY AVAILABLE

34. Title II of the ADAAA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. *See* 42 U.S.C. § 12132.

35. In 1998, the United States Supreme Court recognized that status as an HIV positive individual qualifies as a disability within the meaning of the ADAAA, even when the disease has not progressed to the symptomatic stage. *See Bragdon v. Abbott*, 524 U.S. 624 (1998).

36. Doe is a qualified person with a disability pursuant to the ADAAA.

37. The Federal Regulations interpreting the 2008 amendments to the ADAAA require jails and prisons to house inmates in the most integrated setting appropriate to their needs, and further prohibit jails and prisons from housing a disabled inmate in a section of the facility that does not offer the same programs as the section of the facility where he would otherwise be housed. *See* 28 C.F.R. § 35.152(b)(2).

38. The provisions of Title 42, Section 12132 extend to discrimination against inmates in a state prison or county jail. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

39. Upon arrival at BCJ, Doe was housed in general population. Upon being informed that Doe was HIV positive, employees of the BCJ transferred Doe to segregation based upon his HIV status. Doe would have otherwise been eligible for programs, services and activities generally available to the pretrial detainee population including regular access to showers, television, telephones, religious services, freedom to use the pod dayroom, outdoor recreation and access to games.

40. Despite his eligibility for these programs and services, Doe was housed in a high security portion of the facility and denied equal access to the programs and services provided in general population. Isolating Doe in the high security Pod was not the most integrated setting appropriate for his needs, and Defendant isolated Doe in the high security pod because of his HIV status.

41. The Sheriff's Office allowed other pretrial detainees who were not HIV positive to enjoy programs and services to a greater degree than the access that it afforded to Doe, and the exclusion of Doe from receiving the equal benefit of these programs and services constitutes a discriminatory practice in violation of Title II of the ADAAA for which Sheriff's Office is liable.

## MEDICAL NEGLIGENCE

42. CCS and Corizon owed a common law duty to provide adequate medical care to patients diagnosed with life-threatening illnesses, including HIV. CCS and Corizon either knew or should have known that failure to initiate or provide continuity of care in the

administration of HAART can cause serious adverse complications up to and including death.

43. CCS and Corizon breached their duty by failing to provide Doe with any life-sustaining HIV medication, despite actual knowledge that Doe was HIV positive.

44. As a direct and proximate result of the failure by CCS and Corizon to initiate HIV therapy, Doe suffered physical and mental harm, including fear that his condition would deteriorate, which led to depression, sleeplessness, despair, agitation and stress for which CCS and Corizon are liable.

## V. RELIEF REQUESTED

45. Based upon the facts set forth above, Plaintiff respectfully requests the following relief:

   A. A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 in favor of Plaintiff declaring that Defendant Sheriff's Office violated the ADAAA by excluding Doe from equal participation in programs and services generally provided at the PCDC because of his HIV status;

   B. A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 in favor of Plaintiff declaring that CCS and Corizon implemented or ratified a policy or practice of medication administration that did not provide continuity of care for inmates on life-sustaining HAART, and that CCS and Corizon's application of its policy or practice deprived Plaintiff of HAART in violation of his rights as secured by the Fourteenth Amendment of the United States Constitution;

C. An award of compensatory damages against all Defendants, and a separate award of punitive damages under state law against CCS and Corizon for conduct life-threatening to humans;

D. An award of attorney's fees, costs and any other such other relief as the Court deems just and equitable.

**WHEREFORE**, all premises considered, Plaintiff respectfully requests judgment against these Defendants in an amount in excess of $75,000.00, along with such other relief as the Court deems just and equitable.

                Respectfully submitted,

                /s/ Charles D. Hancock

                Charles D. Hancock
                Ark. Bar No. 2001022
                Hancock Law Firm
                *610 E. 6th St.*
                *Little Rock, Arkansas 72202*
                Office: (501) 372-6400
                Facsimile: (501) 372-6401
                hancock@hancocklawfirm.com

CO-COUNSEL:
J. Spencer Bryan, OBA # 19419 [Subject to admission Pro Hac Vice]
Steven J. Terrill, OBA # 20869 [Subject to admission Pro Hac Vice]
Bryan Terrill, PLLC
9 East 4th Street, Suite 307
Tulsa, OK 74103
Tele: (918) 935-2777
Fax: (918) 935-2778
jsbryan@bryanterrill.com

Attorney lien claimed